KARL S. WEIMAR *vs.* EDWARD E. NEWMAN *et al.*
KARL S. WEIMAR *et ux. vs.* SAME.

MAY 18, 1951.

PRESENT: Flynn, C. J., Capotosto, Baker, Condon and O'Connell, JJ.

CAPOTOSTO, J. These two petitions were brought under general laws 1938, chapter 31, §14, against the respondents as assessors of taxes of the town of North Kingstown in this state for the recovery of certain taxes paid to that town under protest by the petitioners. The petitions were heard together in the superior court by a justice thereof, sitting without a jury, who rendered a decision in both cases in favor of the petitioners. The respondents have duly prosecuted their bills of exceptions to this court alleging that the decision in each case is against the law and the evidence. No procedural question is involved.

The agreed statement of facts shows that petitioners, husband and wife, own property in the town of North Kingstown. The husband admittedly is an *assistant* professor at Brown University, hereinafter referred to also as Brown or the university. On June 15, 1949 the respondents assessed against him a tax on certain tangible personal property based on a valuation of $760, and at that time they also assessed against both petitioners a tax on certain real estate valued at $5,540.

Petitioners contend that the taxes were illegally assessed because of the tax exemption provisions in (1) the charter of Brown University; (2) public laws 1863, chapter 451; and (3) general laws 1938, chapter 29, §2. Respondents oppose that contention on the ground that under all the

provisions upon which petitioners rely the taxes in question were properly assessed against them.

The charter of Brown University, which was granted at the general assembly of the governor and company of the Colony of Rhode Island and Providence Plantations held in February 1764, reads in part as follows:

"And furthermore, for the greater encouragement of this seminary of learning * * * it is hereby granted, enacted, ordained and declared, that the College estate, the estates, persons, and families of the President and *Professors,* for the time being, lying and being within the Colony * * * shall be freed and exempted from all taxes * * *." (italics ours) 6 Rhode Island Colonial Records 390.

Almost one hundred years later the legislature enacted public laws 1863, chapter 451, which is the controlling statute in this case. In view of its importance in the circumstances it is advisable to outline the background of this statute. Acting on a resolution of the city council of Newport instructing its senator "to endeavor to procure the *alteration or repeal* of so much of the charter of Brown University, as exempts the property of the President and *Professors* from taxation, the said Council, stating that in their opinion there was no justifiable reason for such an exemption," the senate referred the resolution to its judiciary committee. (italics ours) Senator Elisha R. Potter, later an associate justice of this court, on August 26, 1862 filed a unanimous report on behalf of such committee. That report deserves serious attention because of the discussion of the legal questions therein considered. See 50 Rhode Island Acts, Resolves and Reports, August 1862.

Omitting particulars, the aforesaid committee unanimously reported an act, as appears in the report, that "So much of the act entitled 'An act for the establishment of a college or university within this colony,' passed at February session, A. D. 1764, as exempts the estates, persons and families of the President and *Professors* of said

institution, now known as Brown University, from taxation, is hereby repealed." (italics ours)   It will be noted that the proposed act did not affect the college property, but only sought to repeal the exemption of the college officers and professors.   Among other things the report stated: "Some of the committee were of opinion that it would be better, as a mark of respect and as the legislature do not wish even to appear to do anything to the injury of the college, to make the act conditional, and to request the consent of the corporation to it.   If they refused, it would still be in the power of the legislature to repeal the exemption unconditionally.   But the majority of the committee think best to report the bill unconditionally * * *."

The controversy thus raised apparently resulted in a compromise which is clearly reflected in P. L. 1863, chap. 451.   For clarity and because of its controlling effect on the question presently under consideration we quote that statute in full.

*"It is enacted by the General Assembly as follows:*

Section 1.   The corporation of Brown University in Providence *consenting* hereto, that the estates, persons and families of the President and Professors, for the time being, of said University, and of their successors in office, shall not hereafter be freed and exempted from taxes for more than the amount of ten thousand dollars, for each of such officers, his estates, person and family included.

Sec. 2.   The vote of said corporation under the seal, and certified by the secretary thereof, declaring that the corporation, being authorized by the President and Professors of said University, does in behalf of the President and Professors, and in behalf of said corporation *consent to this act,* shall be deemed and taken to be proof of their consent thereto, when said vote shall have been filed in the office of the Secretary of State."   (italics ours)

The corporation of Brown held a special meeting on February 11, 1863 for the purpose of giving its consent

to the terms of the act as therein required. After a number of preliminary clauses which, among other things, made specific reference to the act, the corporation expressed its consent in the following language:

"Therefore, in order to manifest our cordial compliance with a reasonable wish of the General Assembly, as expressed in said Act,

It is hereby voted and declared by the Corporation of Brown University, that being authorized by the President and *Professors* of said University, this Corporation does, in behalf of the President and *Professors* and in behalf of said Corporation, *consent* to the said Act, passed by the General Assembly of the State of Rhode Island at its present session as aforesaid; and the Secretary of this Corporation is hereby instructed to file a copy of this vote, under the seal of the Corporation and certified by himself, in the office of the Secretary of State, as proof of the *consent* of this Corporation thereto." (italics ours)

The act thus consented to is now incorporated in an abbreviated form in our general tax exemption statute, G. L. 1938, chap. 29, §2.

The ultimate issue in this case narrows down to the question whether Karl S. Weimar, an *assistant* professor at Brown University, and his wife are entitled to the tax exemption which they claim. In considering that question it is of the utmost importance to bear in mind that both the charter and public laws 1863, chapter 451, now G. L. 1938, chap. 29, §2, grant the exemption to the "professors" of the university and their respective estates, persons and families included. In 1764, the date of the charter, only the rank of professor was in existence at Brown. Furthermore, in so far as definitely appears of record in the instant case, only such rank of professor obtained when the university consented to the enactment of P. L. 1863, chap. 451.

The record before us does not definitely show when, after 1863, the university established the offices of associate and assistant professors. Although in the discharge of their

respective duties the incumbents of those newly created offices apparently are allowed freedom of action similar to that of professors, nevertheless the university has always maintained an academic distinction between professors, as such, and others who in more recent years were given the title of associate and assistant professors. It may be, as the record seems to indicate, that from a certain viewpoint the university for its own purposes has adopted the policy of treating all grades of professors on an equal footing. However, it is clear that notwithstanding such policy Brown adheres to its ancient practice and draws a distinction, which is apparently founded in tradition, between the rank of professor and that of associate or assistant professor.

The only question for our determination is whether the exemption from taxation granted by P. L. 1863, chap. 451, covered professors of all grades, or whether the term "professors" as therein used, the university then consenting thereto, was to apply only to those persons who held the rank of professor without any qualifying word attached to that title. Every statute is to be construed with reference to its intended scope and the purpose of the legislature in enacting it. It is fundamental that if the language of a statute is free from ambiguity and expresses a definite and sensible meaning, that meaning is conclusively presumed to be the one which the legislature intended to convey. In such circumstances the statute must be interpreted literally. *Blais* v. *Franklin*, 31 R. I. 95; *Berard* v. *Blais*, 56 R. I. 431, 436. Resort to the ordinary rules of construction is unwarranted in such a case, as by so doing ambiguity is likely to be imported into a statute where none exists.

In the instant case there is no room for a construction different from that which is clearly indicated by the language used in P. L. 1863, chap. 451. When that statute was enacted the legislature was dealing with the matter of tax exemptions for professors as they were then known at Brown, and it is clear the university dealt with the

legislature with full knowledge of such existing conditions. As previously stated, there is nothing definite in the record before us showing that the offices of associate and assistant professors were in existence at that time. In the circumstances we have no right to assume that the legislature intended to project into the future the limited right of tax exemption mentioned in the statute for the benefit of persons holding offices that had not yet been created by the university.

Considering the fact that Brown officially and formally consented to the act, it thereby adopted and approved its unambiguous language to meet the then existing conditions. If in 1863 the university entertained the idea of extending the tax exemption to include possible future associate and assistant professors on its faculty, it had the opportunity to request the legislature to extend in equally plain and appropriate terms the tax exemption for the benefit of such officers, or to refuse to consent to the act.

There is no indication in the language of the statute of any such intention on the part of the university and much less on the part of the legislature. The act of the university in consenting to the statute without taking advantage of the opportunity to enlarge the exemption is an important factor in the case. When due consideration is given to the language and purpose of P. L. 1863, chap. 451, in the light of its history and Brown's consent thereto, it is clear to us that the exemption from taxation therein granted was not intended to apply to an associate or assistant professor.

Considerable reference was made in argument by petitioners to that part of the charter which provides that its terms shall be favorably construed in behalf of the university. Whatever may be the force of that provision in other circumstances, it is inapplicable in the instant case because in our judgment, for the reasons herein set forth, the statute of 1863 which was enacted after the charter

and with the consent of the university is free from ambiguity.

Petitioners further claim that heretofore no distinction has been made by certain municipalities in this state in granting the exemption under consideration to all grades of professors at the university. They therefore argue that such practice is an "executive interpretation" of the statute which is of weight in determining its meaning as a matter of law. . In the peculiar circumstances of this case we cannot agree with such argument for the reasons already set forth in this opinion. The alleged failure of public officials to enforce the provisions of an unambiguous statute cannot amount to a practical construction so as to affect its true and legal meaning. See *Board of Trustees of Lawrence University* v. *Outagamie County,* 150 Wis. 244, and cases cited; *City of Louisville* v. *Board of Education of City of Louisville,* 154 Ky. 316.

The respondents' exception to the decision in each case is sustained, and on June 6, 1951 the petitioners may appear before this court and show cause if any they have why the cases should not be remitted to the superior court with direction to enter judgment for the respondents.

*Tillinghast, Collins & Tanner,* for petitioners.

*James H. Donnelly,* Town Solicitor, for respondents.